UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REAGENT FUND II, LP | ) | Civil Action No.:  _cv-22-12124_____ |
|     Plaintiffs | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| LOTUS GUNWORKS OF | ) | |
| SOUTH FLORIDA, LLC; | ) | |
| LOTUS GUNWORKS/NAPLES, LLC; | ) | |
| 3554 NW FEDERAL HIGHWAY, LLC; & | ) | |
| 2390 VANDERBILT BEACH ROAD, LLC, | ) | |
|     Defendants. | ) | |

## COMPLAINT

The Plaintiff, REAGENT FUND II, LP, as and for its complaint against the Defendants, states and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S. 1332 because the parties have principal places of business in different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, as shown herein.

2. Venue is proper pursuant to 28 U.S. 1391 (b) (2) because a substantial part of the events described herein took place in Massachusetts.

## PARTIES

3. The Plaintiff, Reagent Fund II, LP, is a limited partnership formed and existing under the laws of the Commonwealth of Massachusetts and has its principal place of business in the Commonwealth of Massachusetts.

4. The Defendant Lotus Gunworks of South Florida, LLC is a limited liability company formed and existing under the laws of the State of Florida and has its principal place of business in the State of Florida.

5. The Defendant Lotus Gunworks/Naples, LLC is a limited liability company formed and existing under the laws of the State of Florida and has its principal place of business in the State of Florida.

6. The Defendant 3554 NW Federal Highway, LLC is a limited liability company formed and existing under the laws of the State of Florida and has its principal place of business in the State of Florida.

7. The Defendant 2390 Vanderbilt Beach Road, LLC is a limited liability company formed and existing under the laws of the State of Florida and has its principal place of business in the State of Florida.

8. The Defendants, Lotus Gunworks of Florida, LLC; Lotus Gunworks/Naples, LLC; 3554 NW Federal Highway, LLC; and 2390 Vanderbilt Beach Road, LLC (hereinafter, collectively referred to as the "Defendants" or the "Sellers") are the owners of real estate and businesses operating under the following names at the respective following addresses: Lotus Gunworks of South Florida, at 3558 NW Federal Highway, Jensen Beach, Florida 34957; and Lotus Gunworks/Naples, at 2390 Vanderbilt Beach Road, Naples, Florida 34109 (hereinafter, the "Locations").

9. C. Robert Marcum is the manager of each of the Defendants.

**FACTUAL ALLEGATIONS**

**The Defendants' Efforts to Sell the Property**

10. From approximately December 2020 and at all relevant times thereafter, David Founds and Dean Cena of World Business Brokers, Inc. acted as brokers (hereinafter, collectively referred to as the "Broker") representing and with the authority of the Sellers in the Sellers' efforts to sell the property and assets related to the Locations.

11. During this time period, upon information and belief, the Broker engaged in discussions with several prospective buyers, none of whom executed a letter of intent or other agreement with the Sellers.

12. The property and assets related to the Locations, and which were included in the sale, per the Broker's public listing of the Property, included, without limitation, clear title to the real property; furniture, fixtures, and equipment; systems; intellectual property; and inventory (hereinafter, collectively referred to as the "Property").

13. In December 2021, the Broker engaged in initial discussions with the Plaintiff regarding the Plaintiff's purchase of the Sellers' Property.

**The Plaintiff's First Proposed Letter of Intent and Subsequent Negotiations**

14. On or about April 29, 2022, after various discussions between the Plaintiff and the Broker acting on behalf of the Sellers, the Plaintiff submitted a letter of intent (hereinafter referred to as the "First Letter of Intent") to purchase the Sellers' Property for $19.5 million, including, among other things, that the Sellers would finance 80% of the value of the real estate and furniture, fixtures, and equipment.

15. On or about May 4, 2022, Mr. Marcum, on behalf of the Sellers, emailed the Plaintiff and requested a phone call to discuss the First Letter of Intent.

16. Thereafter, on or about May 4, 2022, the Plaintiff and Mr. Marcum, on behalf of the Sellers, engaged in a phone call in which the Sellers requested a revised letter of intent that would include a lower amount of Sellers-backed financing.

17. The Plaintiff then engaged in discussions with the Sellers' financial advisor, Layne Hoekama.

18. At all relevant times, Mr. Hoekama acted with the knowledge and authority of the Sellers in his dealings with the Plaintiff.

19. The discussions between the Plaintiff and Mr. Hoekama were centered on crafting a revised letter of intent to meet the Sellers' demands.

20. On or about May 6, 2022, the Plaintiff submitted revised loan terms with respect to the April 29, 2022, letter of intent, and such revised loan terms provided, among other terms, that the Buyer would refinance with a bank in order to reduce Seller-backed financing to a maximum of $9 million, fully subordinated to any bank debt.

21. On or about May 13, 2022 – after approximately one week without any communication between the Plaintiff and the Sellers, or anyone acting on behalf of the Sellers – Mr. Hoekama terminated discussions with the Plaintiff, claiming that the Sellers were going to sell the Property to a different buyer.

22. At or about the same time, Mr. Marcum, on behalf of the Sellers, informed the Plaintiff that the Sellers were terminating discussions due to an internal fight with the Sellers' Broker.

23. Mr. Marcum, on behalf of the Sellers, and the Plaintiff agreed to speak by phone on May 16, 2022.

4

24. On May 16, 2022, in the phone call between the Plaintiff and Mr. Marcum, on behalf of the Sellers, the Plaintiff agreed to work with the Broker to reach a set of terms that would be mutually agreeable to both the Sellers and the Broker.

25. Also, during the May 16, 2022 phone call, the Plaintiff and the Sellers discussed terms for a revised letter of intent, by which the Sellers would agree to a lower purchase price in exchange for less Sellers-backed financing.

26. Also, during the May 16, 2022 phone call, the Plaintiff and the Sellers discussed a spectrum of offers ranging from $9 million of Sellers-backed financing with a purchase price of $19.5 million to no Sellers-backed financing with a purchase price of $15 million.

27. During subsequent conversations between the Plaintiff and the Sellers' financial advisor, the Sellers expressed a preference for a purchase price of $17.5 million with $4 million of Sellers-backed financing.

28. On May 17, 2022, the Sellers and the Broker agreed to the revised brokerage terms, which were negotiated by the Plaintiff.

**The Plaintiff's Second Letter of Intent and Subsequent Negotiations**

29. On or about May 26, 2022, the Plaintiff submitted to the Sellers a second letter of intent, which included a purchase price of $17.5 million for the Property and $4 million in Sellers-backed financing (hereinafter, the "Second Letter of Intent").

30. This reduction in the amount of the Sellers-backed financing was included in the Second Letter of Intent upon the insistence of the Sellers, as they were no longer comfortable with the amount of financing.

31. On May 29, 2022, Mr. Marcum, on behalf of the Sellers, sent an email to the Plaintiff expressing concern with the total amount of Sellers-backed financing and proposing a lower purchase price of $16.5 million with no Sellers-backed financing.

32. On May 30, 2022, Mr. Marcum, on behalf of the Sellers, sent to the Plaintiff an email that described certain aspects of the Property to be sold, including inventory balance and layaway figures.

33. On May 30, 2022, the Plaintiff proposed revised terms to the Sellers: either $16.5 million purchase price with $2 million in Sellers-backed financing, or $15.5 million with no Sellers-backed financing.

34. Thereafter, on May 30, 2022, Mr. Marcum, on behalf of the Sellers, responded in writing to the Plaintiff's proposals by agreeing to proceed with the $15.5 million purchase price with no Sellers-backed financing.

**The Plaintiff's Third Letter of Intent and Subsequent Negotiations**

35. On May 31, 2022, the Plaintiff submitted to the Sellers a revised letter of intent, which included, among other things, a purchase price of $15.5 million with no Sellers-backed financing (hereinafter, the "Third Letter of Intent").

36. Between May 31, 2022 and June 3, 2022, the Plaintiff and Mr. Hoekama engaged in several discussions regarding the Sellers' insistence and requirement that a multitude of terms of the agreement – other than purchase price and financing options – would need to be resolved at this stage of the transaction so that such terms would not remain as an open item in subsequent discussions.

6

37. The discussions between May 31, 2022, and June 3, 2022 between the Plaintiff and Mr. Hoekama centered on the handling of working capital items, including cash on hand, inventory, accounts payable, layaway items, and outstanding gift cards.

38. During these discussions, the Plaintiff repeatedly expressed concern regarding the need for such in-depth negotiations of minor details if the Sellers were not subject to an agreement to deal exclusively with the Plaintiff in the Sellers' efforts to sell the Property.

39. In response to the Plaintiff's repeatedly expressed concern about the lack of exclusivity, Mr. Hoekama assured the Plaintiff that the Sellers had terminated discussions with any other interested parties, and, furthermore, that it was critical for the Sellers to have the details as to the working capital items be explicitly specified in the letter of intent as opposed to during the drafting of the final purchase and sale agreement.

40. On June 3, 2022, Mr. Hoekama sent to the Plaintiff a redlined version of the Third Letter of Intent, which included comments from the Sellers' legal counsel.

41. In the June 3, 2022, email that was sent to the Plaintiff, Mr. Hoekama specifically defined working capital as "cash + inventory – accounts payable – gift cards – layaway."

42. Between June 3, 2022, and June 8, 2022, the Plaintiff and Mr. Hoekama engaged in extensive discussions about various aspects of the transaction, including, but not limited to, specifics as to cash, inventory, layaway, gift cards, and accounts payable.

43. Between June 3, 2022, and June 8, 2022, in light of continued discussions with the Plaintiff, Mr. Hoekama requested certain information from the Sellers' certified public accountant.

44. On June 8, 2022, Mr. Hoekama sent to the Plaintiff financial summaries with year-to-date financials and twelve months of monthly rolling inventory, gift card, and layaway balances, for the purpose of and with the understanding that such details would be used in drafting and submitting another revised letter of intent.

**The Plaintiff's Fourth Letter of Intent and the Defendant's Last-Minute Wavering**

45. After extensive discussions, negotiation, and review of various financial details related to the Property, on June 10, 2022, the Plaintiff submitted another revised letter of intent (hereinafter, the "Fourth Letter of Intent"), which included language regarding the dollar credits to be given for gift cards (specified explicitly as $148,611) and layaway items (specified explicitly as $224,260), that the Sellers would be responsible for all accounts payable, and that the value of inventory was specified explicitly to equal to $3,390,395.

46. The Fourth Letter of Intent reflected and memorialized the agreement that had been reached between the Plaintiff and the Sellers after extensive discussions and negotiations.

47. On June 10, 2022, Mr. Hoekama advised the Plaintiff that the Sellers agreed that all the terms of the transaction were in place.

48. On June 13, 2022, the Sellers emailed the Plaintiff to inform them that the Sellers expected to sign a letter of intent with another party for the sale of one of the locations and also stated that the Plaintiff spent considerable time on this transaction.

49. Thereafter, on June 13, 2022, Mr. Marcum told the Plaintiff that the recent changes as provided in the Fourth Letter of Intent were too complicated for the Sellers, but that a simpler deal might still be possible.

50. Thereafter, on June 13, 2022, in response to the Sellers' concerns, the Plaintiff sent an email to the Sellers, in which the Plaintiff proposed simplified terms where the purchase price would be $15.5 million (as insisted upon by the Sellers); the Plaintiff would be responsible for accounts payable and all layaway and gift card liabilities; and the Property would include cash balances.

51. On June 14, 2022, after various phone conversations between the Plaintiff and Mr. Hoekama, in which the Sellers demanded certain language regarding the handling of some

balance sheet items, the Plaintiff sent an email to the Sellers and Mr. Hoekama in which the Plaintiff provided a summary of amounts of various balance sheet items (as requested by the Sellers) and in which the Plaintiff noted that the Sellers informed them that they intended to make a decision by the following day.

52. On June 15, 2022, the Sellers sent to the Plaintiff revisions to the Fourth Letter of Intent, which included a reduction of the exclusivity period reduced from 90 days and an additional $100,000 non-refundable escrow deposit upon the termination of due diligence, both of which were new demands from the Sellers.

53. The Plaintiff advised the Sellers that an accelerated timeline to close the transaction would result in the incurrence of substantial legal, financing, application, structuring and other costs prior to the completion of the purchase agreements.

54. Despite the increased costs to the Plaintiff, the Sellers insisted on the shortest possible timeline for the transaction to be closed.

55. On June 15, 2022, in an email from the Sellers to the Plaintiff, the Sellers expressed their desire to have the transaction consummated that day.

**The Executed Agreement**

56. Thereafter on June 15, 2022, the Plaintiff sent to the Sellers a revised letter of intent (hereinafter, the "Fifth and Final Letter of Intent"), which included the agreed-upon timeline that would apply subsequent to the execution of the letter of intent, including thirty days for a draft of the asset purchase agreement to be submitted, and a seventy-five-day exclusivity period.

9

57. On June 16, 2022, Mr. Hoekama sent to the Plaintiff the executed signature page (including the Sellers' signature) of the Fifth and Final Letter of Intent.

58. Thereafter on June 16, 2022, the Plaintiff sent to the Sellers and Mr. Hoekama a final countersigned version of the Fifth and Final Letter of Intent.

**The Plaintiff's Actions After the Execution of the Fifth and Final Letter of Intent and the Defendants' Ultimate Breach**

59. On July 1, 2022, which was 15 days after the execution of the Fifth and Final Letter of Intent and 15 days sooner than the date by which they were required to do so, the Plaintiff's counsel sent to the Sellers' counsel the initial drafts of the closing documents.

60. Furthermore, during the days and weeks immediately following the execution of the Fifth and Final Letter of Intent, the Plaintiff took a number of steps to establish the necessary business entities, to obtain commitments from banks that would finance the transaction, to create the necessary legal framework for the operation of the businesses, to ensure compliance with the necessary regulations, and to apply for the necessary Federal Firearms Licenses.

61. The Plaintiff undertook these various actions as expeditiously as possible in order to meet the Sellers' demands for the shortest possible time frame for closing the transaction.

62. The Plaintiff undertook these various actions at considerable costs exceeding $100,000 in order to meet the Sellers' accelerated timeline for closing the transaction.

63. On July 8, 2022, Mr. Hoekama sent a comprehensive list of 59 issues regarding the proposed asset purchase agreement for the businesses.

64. None of the 59 issues concerned the purchase price, or the specifics as to the various balance sheet items.

65. The list of 59 issues provided by the Sellers was comprehensive and exhaustive, inclusive of all details potentially under dispute, including such minor items as punctuation and capitalization (for example, one of the 59 listed issues was "2.01(b) 'agreement' should be capitalized.")

66. None of the 59 issues concerned items upon which the Sellers ultimately based their decision to tortiously abandon the transaction, as set forth below.

67. Over the course of the discussions regarding the final closing documents, the only items discussed by either the Sellers or the Plaintiff were among those 59 issues.

68. On July 14, 2022, the Plaintiff sent to the Sellers a second draft of the closing documents, which addressed the concerns raised by the Sellers.

69. On July 19, 2022, Mr. Hoekama sent a text message to the Plaintiff, in which he states that the Sellers' attorney is unable to work on the remaining issues and that the Sellers were retaining another attorney.

70. On July 22, 2022, a new attorney communicated to the Plaintiff that he was now representing the Sellers and would provide comments and draft schedules.

71. On July 26, 2022, the Seller provided comments to the Plaintiff regarding the second draft of the closing documents.

72. Within one week thereof, on August 1, 2022, the Plaintiff sent to the Sellers a third draft of the closing documents.

73. In the executed Fifth and Final Letter of Intent, the Sellers agreed to "reasonably cooperate with the [Plaintiff] Buyer to facilitate inspection of the Property [which included responding to] requests for information and reports that may need to be prepared by the Sellers…"

74. The Plaintiff made several requests to the Sellers that they provide schedules of the Property.

75. On August 12, 2022, the Plaintiff requested that the Sellers provide draft schedules.

76. On August 12, 2022, the Sellers' counsel advised that the draft schedules would be ready "next week."

77. On August 12, 2022, the Sellers also responded to the Plaintiff's third draft of the closing documents.

78. Within three days, on August 15, 2022, the Plaintiff sent a fourth draft of the closing documents to the Plaintiff.

79. On August 23, 2022 – which was less than one week before the exclusivity period was set to expire on August 29, 2022 – the Sellers responded to the fourth draft of the closing documents.

80. On August 26, 2022, the Plaintiff expressed its concern about the impending expiration of the exclusivity period.

81. On August 26, 2022, the Plaintiff sent to the Sellers a proposed extension of the exclusivity period agreed to in the letter of intent, which extended the exclusivity period from August 29, 2022, to September 16, 2022.

82. On August 28, 2022, the Sellers executed the extension of the exclusivity period to September 16, 2022.

83. On September 8, 2022, the Plaintiff sent to the Sellers a fifth draft of the closing documents.

84. On September 8, 2022, the Plaintiff also requested from the Sellers a status on when the draft schedules would be provided.

85. On September 13, 2022, the Sellers communicated to the Plaintiff that the schedules and the response to the latest draft of the closing documents would be provided by the end of the following day.

86. On the following day, i.e., September 14, 2022, the Sellers did not provide the schedules and the revisions as promised, and indeed the Sellers did not provide such schedules and revisions at any point thereafter,

87. On September 14, 2022, the Plaintiff informed the Sellers that the parties would need to execute an additional extension prior to the expiration of the period that was to end on September 16, 2022, and again requested a status of the disclosure schedules.

88. In response to this request, the Sellers informed the Plaintiff that they were "in the queue and will send ASAP."

89. Despite these multiple requests and assurances, instead of providing the schedules and revisions as promised, on September 14, 2022, the Sellers informed the Plaintiff that the Sellers "need assurances that we are going to be able to meet that… $15.5 million at closing."

90. Thereafter on September 14, 2022, the Plaintiff and the Sellers had a phone call, during which the Sellers acknowledged that they were going to be receiving the agreed-upon purchase price at closing.

91. The Sellers admitted in writing that "the math is in there to where the closing might generate over the $15.5 million."

92. On September 15, 2022, the Plaintiff, the Sellers, their respective counsels, and Mr. Hoekama engaged in a conference call, during which the parties collectively reviewed the entire set of closing documents, page-by-page from start to finish, and Sellers acknowledged agreement on all substantial terms of the transaction.

93. The Sellers explicitly stated that, in response to Sellers' request for assurances regarding the net proceeds from September 14, 2022, they were in agreement that they would be receiving a minimum of $15.5 million in net proceeds from the transaction.

94. During the September 15, 2022, conference call, none of the parties or participants mentioned any concerns regarding the purchase price or how the balance sheet items would be treated.

95. Throughout the transaction, the Sellers were dilatory in submitting required schedules, despite repeated pleas from the Plaintiff that they be provided.

96. As of September 15, 2022, the Plaintiff was prepared to sign the purchase and sale agreement, but for the Sellers' failure to submit the required schedules.

97. Indeed, during the September 15, 2022, conference call, the Plaintiff stated that it was prepared to sign the closing documents instead of extending the exclusivity period if the schedules were provided.

98. During the September 15, 2022, conference call, the Plaintiff also expressed that it was open to allowing certain non-critical schedules to be provided within a fixed period after the closing documents were signed.

99. During the September 15, 2022, conference call, the Sellers stated that they needed a small amount of additional time solely to submit all required informational schedules and

agreed to a two-week extension of the exclusivity period, which was executed on September 16, 2022, and which extended the exclusivity period to September 30, 2022.

100. The Sellers executed this two-week extension of the exclusivity period because they understood that they would be receiving a minimum of $15.5 million in net proceeds from the transaction.

101. The Plaintiff and the Sellers agreed to a short extension because they had a shared understanding that the transaction was nearly complete, that there were no remaining substantial issues with the closing documents to be discussed, and that the two-week extension was solely for the Sellers to provide the required schedules

102. September 19, 2022, which was one business day after the Sellers executed the extension of the exclusivity period, Mr. Hoekama informed the Plaintiff that the Sellers were no longer interested in pursuing the transaction entirely because the Sellers were no longer comfortable with the agreed-upon purchase price.

103. Prior to this point, the Sellers had not raised as an issue the amount of the purchase price as agreed upon in the Fifth and Final Letter of Intent and in the closing documents.

104. In communications subsequent to the Sellers' decision to abandon the agreement, Mr. Marcum, on behalf of the Sellers, claimed that he did not understand what he was signing when he executed the letter of intent and that the Sellers were now demanding revised terms, including the following: (a) a purchase price of $17.5 million as opposed to $15.5 million; (b) for the included amount of inventory included with the sale to be decreased from the previously-negotiated amount of $3,330,395 down to $3,000,000; (c) that the Sellers no longer provide the cash amounts to the Plaintiff to pay down the existing gift card liability balance of $148,611; (d) that the Sellers no longer provide the cash amounts to the Plaintiff to pay down the existing layaway liability balance of $224,260; and (e) that the Plaintiff

15

absorb all accounts payable of the Sellers, which was estimated to be $339,716, even though the Fifth and Final Letter of Intent explicitly specified that "The Sellers shall be responsible for paying all accounts payable at the time of Closing such that the Property is delivered to the Buyer free and clear of any accounts payable."

105. Each of the newly demanded items is in clear contradiction to the terms agreed- upon in the Fifth and Final Letter of Intent.

106. The sum of the newly demanded items is $3,042,982, which represents an increase to the net purchase price of approximately 20%.

107. Despite his stating otherwise, Mr. Marcum clearly understood what he was signing when he executed, on behalf of the Sellers, the Fifth and Final Letter of Intent.

108. Even if Mr. Marcum did not understand the treatment of the clearly specified balance sheet items in the Fifth and Final Letter of Intent, there is no justification for an increase in the purchase price in addition to the exclusion of the balance sheet items payable to the Plaintiff.

109. Each of the terms that the Sellers described as being "deal breakers" were clearly and simply described in the Fifth and Final Letter of Intent at the Sellers' own explicit insistence.

110. Each of the terms that the Sellers described as being "deal breakers" were negotiated with the Sellers, the Sellers' financial advisor, and the Sellers' attorneys at length over the course of several months leading up to the execution of the Fifth and Final Letter of Intent.

111. In the negotiations leading up to the execution of the Fifth and Final Letter of Intent, both the Plaintiff and the Sellers' financial advisor communicated plainly to the Sellers, on multiple occasions, the economic impact of each of the terms that they ultimately described as being "deal breakers."

112. The Sellers admitted, in writing to the Plaintiff, that the only terms that were now being

16

amended were those that were specifically agreed to in the Fifth and Final Letter of Intent and not any terms that were left open for discussion prior to the execution of the closing documents.

113. The Sellers admitted, in writing to the Plaintiff, that they were demanding an amendment to the economic terms of the Fifth and Final Letter of Intent because they were "trying to maximize [their] position."

114. The Sellers and the Plaintiff had clearly agreed upon such terms when the Fifth and Final Letter of Intent was executed.

115. During the approximately 90 days of detailed and expensive contract negotiations following the execution of the Fifth and Final Letter of Intent, the Sellers did not express any concern with the terms that they would ultimately claim to be "deal breakers."

116. The Sellers waited until the very end of the exclusivity period to make the demand for revised economic terms, at which point the Plaintiff had already invested a considerable amount of capital, time, and effort into the agreement, making the Plaintiff the most likely to agree to such changes.

117. Despite the clear agreement to the terms set forth in the Fifth and Final Letter of Intent, the Sellers refused to abide by these terms and tortiously abandoned the transaction.

118. After the Sellers' tortious abandonment of the transaction, the Plaintiff offered to provide an unspecified additional amount—above and beyond the agreed-upon purchase price—in order to address the Sellers' newfound and sudden concerns.

119. The Sellers refused to permit any further discussions with the Plaintiff regarding the payment of an unspecified additional amount.

120. The revised terms that the Sellers sought to impose would have increased the cost to the Plaintiff of the transaction by over $3 million from the terms that were agreed to in the

17

executed Fifth and Final Letter of Intent.

121. The Plaintiff reasonably relied upon the Sellers' agreement and obligation to act in good faith and to deal fairly throughout both the extensive negotiations leading up to when the Fifth and Final Letter of Intent was executed and the discussions subsequent thereto.

122. At all relevant times, the Plaintiff had and continues to have available to it the cash necessary to close on the transaction in accordance with the terms of the Fifth and Final Letter of Intent.

**Damages Suffered by the Plaintiff due to the Defendants' Tortious Acts**

123. The Plaintiff expended at least $50,000 on legal bills in connection with the negotiations with the Sellers.

124. The Plaintiff expended at least $20,000 in establishing six entities to be used in the acquisition and operation of the Sellers' businesses, which included costs to expedite such processes on account of the Sellers' demand for a reduced timeline for the closing of the transaction.

125. The Plaintiff expended at least $25,000 that was paid to a bank to proceed with a financing application, which included costs to expedite such an application on account of the Sellers' demand for a reduced timeline for the closing of the transaction.

126. The Plaintiff expended at least $15,000 that was paid to environmental and appraisal groups for the inspection of the properties, which included costs to expedite such inspections on account of the Sellers' demand for a reduced timeline for the closing of the transaction.

127. The Plaintiff expended at least $8,000 that was paid to compliance specialists in connection with the Federal Firearms License applications.

128. The Plaintiff expended $700 for two Federal Firearms License applications for the Locations.

129. The Plaintiff expended $5,000 for three trips to visit the Locations, as was required in order to conduct proper due diligence.

130. The Plaintiff also suffered damages in that it was prevented by the Sellers from closing on the transaction at the favorable price agreed upon by the parties in the Fifth and Final Letter of Intent.

131. The Plaintiff also suffered damages in that it lost an opportunity to create a platform for future growth of its business.

132. The full extent of the Plaintiff's damages is currently unknown, are well in excess of the jurisdictional threshold of this Court, and are to be determined at a trial of this matter.

## COUNT I
### (Breach of Contract)

133. The Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "132" of this Complaint with the same force and effect as though fully set forth herein.

*Material breach due to refusal to sell at the agreed-upon purchase price:*

134. On June 16, 2022, the Plaintiff and the Defendants entered into a written contract whereby the Defendants agreed to sell the Property to the Plaintiffs for a purchase price of $15.5 million.

135. The contractual agreement was reached by the parties after extensive and sophisticated negotiations between the Plaintiff and the Defendants or entities representing the Defendants, contained material terms including a final purchase price for the Property

and both the Parties' respective authorized representatives signed it.

136. The Plaintiff fully performed all its obligations under the contract, other than those that it may have been prevented from performing due to the Defendants' actions.

137. The Defendants materially breached the contract by refusing to sell the Property to the Plaintiff at the agreed-upon purchase price.

*Material breach in failing to reasonably cooperate in providing disclosure schedules.*

138. In the contract, the Defendants agreed to "reasonably cooperate with the Buyer to facilitate inspection of the Property, which will include, but not be limited to, [responding to] requests for information and reports that may need to be prepared by the Sellers."

139. During the several months following the execution of the contract, the Plaintiff made repeated requests for schedules of the Property.

140. Despite multiple assurances that such schedules would be provided, the Sellers never provided any schedules to the Plaintiff.

141. The Defendants' failure to provide the schedules materially breached the contract.

*Material breaches in failing to set aside escrow accounts for gift cards and layaway receipts.*

142. In the contract, the Defendants agreed to "set aside into an escrow account all gross proceeds from the sale of gift cards from the date of the execution of this Letter of Intent through the date of the Closing."

143. The Defendants never set aside an escrow account for proceeds from the sale of gift cards.

144. The Defendants materially breached the contract by failing to set aside an escrow account for proceeds from the sale of gift cards.

145. In the contract, the Defendants agreed to "set aside into an escrow account all gross proceeds from the receipt of layaway deposits from the date of the execution of this Letter

20

of Intent through the date of the Closing.

146. The Defendants never set aside an escrow account for proceeds from the receipt of layaway deposits.

147. The Defendants materially breached the contract by failing to set aside an escrow account for proceeds from the receipt of layaway deposits.

*Material breach in failing to proceed diligently and in good faith.*

148. In the contract, the Defendants also agreed "to proceed diligently and in good faith to the execution of the Asset Purchase Agreements."

149. Despite this agreement, and despite the Plaintiff's good faith actions throughout this process, the Defendants did not proceed diligently nor act in good faith.

150. The Defendants materially breached the contract by refusing to proceed diligently and in good faith to the execution of the Asset Purchase Agreements.

*Material breach in violating the exclusivity provisions.*

151. In the contract and in the extension executed by the parties, the Defendants agreed to deal exclusively with the Plaintiff regarding the sale of the Property.

152. Upon information and belief, during the exclusivity period, the Defendants solicited offers or discussed a possible sale or other disposition of the Property with parties other than the Plaintiff.

153. The Defendants' actions thereby violated the contract by not dealing with the Plaintiff exclusively.

154. The Defendants' actions in violating the exclusivity provisions constituted a material breach of the contract.

155. Plaintiff understood the contract to be binding and reasonably believed that Defendants— through their acts and assurances up until the multiple breaches—believed the same.

156. As a result of the Defendants' multiple material breaches of the contract, the Plaintiff has been damaged in an amount that is currently unknown, that is well in excess of the jurisdictional threshold of this Court, and that is to be determined at a trial of this matter.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

157. The Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "156" of this Complaint with the same force and effect as though fully set forth herein.

158. On June 16, 2022, the Plaintiff and the Defendants entered into a contract whereby the parties agreed to proceed diligently and in good faith to the execution of an asset purchase agreement related to the Property.

159. The Plaintiff fully performed all its obligations under the contract, other than those that it may have been prevented from performing due to the Defendants' actions.

160. The Defendants materially breached the contract by refusing and failing to proceed diligently or in good faith to the execution of an asset purchase agreement.

161. The Defendants' actions constitute a failure to discharge their contractual responsibilities.

162. The Defendants' failure to discharge their contractual obligations were based on a conscious and deliberate act to maximize their bargaining position and, upon information and belief seek a higher bidder in violation of the contract and ignoring and declining to honor Plaintiff's clear, rational, and good faith efforts— entering into five letters of intent, extensive negotiations with Defendants, numerous concessions to appease Defendants and more as described herein— to resolve the contractual relationship between the Parties and instead continuously changed agreed upon terms, strung Plaintiff along and eventually welched on the deal.

163. The Defendants' failure to discharge their contractual obligations unfairly frustrated the purpose of the agreement reached between the parties.

164. The Defendants' failure to discharge their contractual obligations disappointed the reasonable expectations of the Plaintiff with respect to the agreement, including without limitation owning the Property.

165. The Defendants' failure to proceed in good faith resulted in damages to the Plaintiff in an amount that is currently unknown, that is well in excess of the jurisdictional threshold of this Court, and that is to be determined at a trial of this matter.

## COUNT III
### (Fraud in the Inducement)

166. The Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "165" of this Complaint with the same force and effect as though fully set forth herein.

167. Throughout the negotiations immediately leading up to the execution of the final letter of intent, the Defendants expressed that they intended to sell the Property to the Plaintiff for $15.5 million.

168. The Defendants' expressed intention of selling the Property to the Plaintiff for $15.5 million was a material fact of the negotiations and the final letter of intent.

169. At the time the Defendants expressed their intention to sell the Property to the Plaintiff for $15.5 million, the Defendants knew this statement was false.

170. The Defendants made this false statement with the purpose of inducing the Plaintiff to execute the final letter of intent and agree to all its terms.

171. The Plaintiff reasonably and justifiably relied on the Defendants' false statement and acted on it to its detriment by, without limitation, incurring further attorneys' fees, costs, time

23

and labor to bring a deal to fruition that Defendants did not intend to and did not honor.

172. The Plaintiff's reasonable and justifiable reliance on the Defendants' false statement resulted in damages to the Plaintiff of at least $133,000, and that which is to be determined at a trial of this matter.

## COUNT IV
### (Specific Performance)

173. The Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "172" of this Complaint with the same force and effect as though fully set forth herein.

174. The Plaintiff and the Defendants entered into a written agreement whereby they had a meeting of the minds as to all essential terms of the contract and behaved as such.

175. The Plaintiff and the Defendants agreed that the Defendants would sell to the Plaintiff the Property for a purchase price of $15.5 million.

176. The Plaintiff and the Defendants agreed what constituted the Property to be sold.

177. The Plaintiff and the Defendants agreed that the Property would include an amount of inventory equal to $3,330,395, with an adjustment to be made based upon the actual inventory to be measured the day before the closing of the transaction.

178. The Plaintiff and the Defendants agreed that the Defendants would keep all cash from any accounts associated with the Property at the time of the closing of the transaction.

179. The Plaintiff and the Defendants agreed that the Defendants would pay the Plaintiff $148,611 representing the gift card liability balance times an estimated redemption rate, with an adjustment to be made based on the proceeds from the sale of gift cards from the date of the agreement to the date of the closing of the transaction.

180. The Plaintiff and the Defendants agreed that the Defendants would pay to the Plaintiff

24

$224,260, representing the layaway deposits balance times an estimated redemption rate, with an adjustment to be made based on the proceeds from the receipt of layaway deposits from the date of the agreement to the date of the closing of the transaction.

181. The Plaintiff and the Defendants agreed that the Defendants would pay all accounts payable at the time of the closing of the transaction and that the Property would be delivered to the Plaintiff free and clear of any accounts payable.

182. The Plaintiff and the Defendants agreed upon a specific time frame within which an inspection of the Property would take place.

183. The Plaintiff and the Defendants agreed upon a specific time frame within which the closing documents would be drafted.

184. The Plaintiff and the Defendants agreed upon a specific time frame within which the earnest money deposits would be delivered.

185. The Plaintiff and the Defendants agreed upon a specific time frame within which the closing of the transaction would take place.

186. The Defendants agreed to proceed diligently and in good faith to execute whatever documents may be necessary to close on the transaction.

187. The Plaintiff fully performed all its obligations under the contract, other than those that it may have been prevented from performing due to the Defendants' actions and was ready, willing and able to tender the money necessary to pay the purchase price and buy the Property and demanded through communications with Defendants that they proceed to a closing.

188. The Defendants have refused to proceed to a closing and perform its obligations under the contract.

189. The Defendants have refused to proceed diligently and in good faith to execute the

documents necessary to close on the transaction.

190. If the Defendants were to have adhered to their obligation to proceed diligently and in good faith to execute the documents necessary to close on the transaction, then the transaction would have proceeded to closing, according to the various essential elements upon which the Plaintiff and the Defendants had reached a meeting of the minds.

191. The Plaintiff is clearly entitled to the Defendants' performance of its obligations under the contract.

192. The Plaintiff lacks any adequate remedy at law other than specific performance of the contract.

193. Justice and equity require that the Defendants perform their obligations under the contract.

194. The Plaintiff is entitled to a decree of specific performance.

**<u>COUNT V</u>**
**(Violation of M.G.L. c. 93A)**

195. The Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "195" of this Complaint with the same force and effect as though fully set forth herein.

196. Plaintiff is a limited partnership that maintains its principal place of business in Massachusetts and engages in trade and commerce in the Commonwealth of Massachusetts, specifically commercial real estate investment.

197. Defendants are corporations that have engaged in the conduct of trade and commerce in Massachusetts and with Plaintiff by their acts described herein, including entering five letters of intent with Plaintiff, engaging in extensive negotiations with Plaintiff regarding the sale of the Property, as well as partaking in numerous phone calls and emails with Plaintiff, hashing, out every detail of the sale such as purchase price, financing, intellectual

26

property, inventory, gift cards and other things of value associated with the Property .

198. Defendants also breached the Fifth Letter of Intent by failing to perform its obligations under it—namely not setting aside escrow accounts, violating, upon information and belief, the exclusivity provision by soliciting and engaging with other potential buyers during the prohibited period, not proceeding in good faith throughout, refusing to sell Plaintiff the Property at the agreed upon purchase price, failing to provide disclosure statements and engaging in an overall pattern of unfair or deceptive acts to, upon information and belief, leverage their position, increase their bargaining power, string Plaintiff along, force Plaintiff to continuously renegotiate and acting in disregard of known contractual arrangements for their benefit, all at Plaintiff's great detriment and cost.

199. Plaintiff has suffered significant loss of money due to Defendants' unlawful acts described above and throughout this Complaint including attorneys' fees, license fees, travel expenses, consultation fees, bank fees, entity formation costs, appraisal costs, and lost business opportunity.

200. Plaintiff suffered these losses and Defendants' deceptive and unlawful acts primarily and substantially occurred in Massachusetts because, absent the handful of times Plaintiff-- through an authorized representative- visited the Property in Florida, they dealt with Defendants at its principal place of business in Massachusetts.

201. Plaintiff is entitled to and seeks double or treble damages and its reasonable attorneys' fees and costs, in addition to its damages incurred through Defendant's' unlawful acts.

## COUNT VI
### (Promissory Estoppel)

202. Alternatively, if no contract is found to have been formed, through their repeated assurances and acts as described herein Defendants made a promise to sell the Property to

Plaintiff.

203. In consistently making Plaintiff believe through such acts and assurances that it would sell the Property to it and submitting a final purchase price along with other essential terms in writing to which Plaintiff agreed, Defendants should have reasonably expected Plaintiff would rely on their promise and be induced to act which it did by moving ahead with costly preparations in anticipation of the sale, such as attorneys' fees, license application costs, travel expenses, bank fees, appraisal fees and other incurred costs described above in an amount no less than $133,000 and other amounts not now known to be determined at trial.

204. Due to the detriment suffered by Plaintiff due to Defendants' acts and assurances and promise, and the additional lost business opportunity of owning the Property, injustice can only be avoided through enforcement of Defendants' promise to transfer to Plaintiff the Property.

**WHEREFORE**, the Plaintiff, Reagent Fund II, LP, demands judgment against the Defendants, Lotus Gunworks of Florida, LLC; Lotus Gunworks/Naples, LLC; 3554 NW Federal Highway, LLC; and 2390 Vanderbilt Beach Road, LLC, jointly and severally, in an amount to be determined at trial plus interest as well as its reasonable attorneys' fees and costs, treble or double damages under M.G.L. c. 93A, a decree of specific performance for Defendants to transfer the

Property to Plaintiff and for such other and further relief that this Court may deem just, proper,

and equitable.

Dated: December 14, 2022

/s/ Kenneth A. Reich, Esq.
Kenneth A. Reich, Esq. (BBO #549464)
Kenneth Reich Law, LLC
361 Newbury Street
4th Floor
Boston, MA 02115
(781) 608-7267
Kreich@kennethreichlaw.com
*Attorney for Plaintiff*